**In re Melvin E. HORTON, Jr., Debtor.**

**Bankruptcy No. 583–00194–13.**

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Jan. 31, 1989.

J. Christopher Cimaglia, Cimaglia & Seybold, P.C., Dallas, Tex., for debtor.

Waymon G. DuBose, Jr., U.S. Dept. of Justice, Tax Div., Dallas, Tex., for I.R.S.

### MEMORANDUM OF OPINION ON TAX CLAIM

JOHN C. AKARD, Bankruptcy Judge.

### Background

On December 21, 1982, Melvin E. Horton, Jr. (Debtor) filed a petition under Chapter

---

**8.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.

13 of the Bankruptcy Code.[1] On December 24, 1984, the Debtor filed a Modified Chapter 13 Plan. By Memorandum and Order dated July 17, 1985 the Honorable Bill H. Brister, who was then Judge of this Court, confirmed the Debtor's Chapter 13 Plan.

One of the matters left open by the confirmation of the Chapter 13 Plan was the amount of the Debtor's liability to the Internal Revenue Service (IRS). A portion of the dispute between the Debtor and the IRS was resolved in the Tax Court. Subsequently, the Debtor filed a motion for determination of tax liability pursuant to § 505 of the Bankruptcy Code.[2] This Court heard the motion on September 29 and 30, 1988, after which the parties submitted briefs.

## Issues

The Debtor's motion presented three issues. The first issue is whether the Debtor is entitled to a refund on his income tax. The IRS filed a claim in these proceedings for 1980 Federal Income Tax in the amount of $26,952.94. As a result of litigation in the Tax Court concerning the 1980 tax obligation, overpayments for subsequent years through the 1986 tax return, and payments to the IRS by the Chapter 13 Trustee, there is an overpayment of $25,517.89 plus interest in accordance with 26 U.S.C. § 6611 (Internal Revenue Code) (hereafter I.R.C.). This overpayment is subject to setoff for any other tax liabilities of the Debtor, including those asserted by the IRS in this proceeding.

The second issue is determination of the Debtor's liability for Form 941 Taxes (Withholding and Social Security) owned by American Mail Service, a partnership composed of the Debtor and Stanley L. Garner. Post-trial, the parties stipulated that the taxes due by American Mail Service are $2,574.37. Therefore, this amount will be included in the taxes owed by the Debtor.

The third issue is the IRS's assertion of a 100% penalty against the Debtor under I.R.C. § 6672 as the "responsible officer" for Form 941 Taxes withheld from the wages of employees of American Combined Resources Group, Inc. (AMCORE) and its subsidiaries Medstaff, Inc. of Dallas (Medstaff), American Reprocessing, Inc., Amdal Chemical Corporation (Amdal), American Property Managing, Inc., and Solar Technology, Inc. A schedule of the assessments totaling $105,092.20 is attached.

## Facts

Stanley L. Garner (Garner) is a resident of Dallas, Texas. He had numerous business interests and substantial resources. He met the Debtor socially in the mid 1970's while the Debtor was employed as a salesman for a securities brokerage firm. This led to the Debtor handling Garner's securities transactions.

In September, 1980, the Debtor and an associate formed Horton, Hedreene & Co. which engaged in the sale of securities and in investment banking. Garner continued as a client of that business and the Debtor served as an informal investment advisor to Garner.

In Spring, 1981, the Debtor suggested that Garner could find new sources of funding and achieve economies of operation by forming a holding company which would own the various corporations Garner controlled. Consequently, Garner formed AMCORE in April, 1981. During that summer Garner contracted with Horton, Hedreene & Co. for the Debtor to spend half of his time on Garner's business.

In 1981 Garner invested heavily in a business enterprise which he discovered to be

---

**1.** The Debtor is a resident of Dallas, Texas. The case was assigned number 382–01701 in the Dallas Division of the Northern District of Texas. There were many proceedings in that case while it was pending on the Dallas docket, including homestead challenges and hearings on motions to dismiss and motions to convert the case. On September 12, 1983, the case was transferred to the Lubbock Division of the Northern District of Texas on the order of the Chief Bankruptcy Judge for the Northern District of Texas, the Honorable John C. Ford. The case was assigned number 583–00194 on this docket.

**2.** The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are to sections in the Bankruptcy Code.

fraudulent in late summer or early fall of 1981.[3] This revelation placed Garner in a precarious financial position and resulted in a number of lawsuits. Garner anticipated that an involuntary bankruptcy would be filed against him and allegations were made that the corporations were his alter egos.

Several of the corporations were in their formative stages and needed capital infusions to continue operations. Garner was unable to continue making those capital infusions. Additional funds through loans or venture capital were necessary and the Debtor was selected to head a team to secure the loans or venture capital. On December 8, 1981 Garner resigned as President and Chief Executive Officer of AMCORE, retaining the title of Chairman of the Board of Directors. The Debtor was named President and Chief Executive Officer. Shortly thereafter he closed Horton, Hedreene & Co.

On December 23, 1981, Case No. 381–01728–RCM, an involuntary bankruptcy, was filed against Garner in the Dallas Division of this Court.[4] By this time AMCORE was operating as a holding company and owned all outstanding stock of the subsidiaries.

About this time David Mills (Mills) was promoted from President of Medstaff to Vice President of AMCORE.[5] Horton and Mills prepared data, projections and slides which they showed to banks and venture capital companies throughout the winter and spring of 1982 in an attempt to secure operating capital for AMCORE. Their efforts were not successful.

Each of the subsidiaries stood alone in sales, personnel and operations. The pur-

pose of the holding company was to centralize accounting and financial controls. AMCORE and all but two of the subsidiaries were housed in a Dallas building owned by Garner. After the involuntary bankruptcy was filed, Garner devoted two to four days each week on matters related to the bankruptcy and lawsuits, but continued to maintain his office in the AMCORE building.

Edwin Soladay (Soladay) was a vice president and director of AMCORE.[6] Richard O. Wright (Wright) was comptroller of AMCORE.[7] Garner employed Wright for several years prior to the formation of AMCORE. Soladay had a substantial investment in AMCORE and was a partner with Garner in the building occupied by the corporations.

AMCORE handled all finances of the subsidiaries. Garner, Soladay and Wright were the signatories on the bank accounts. When Garner resigned as president of AMCORE in December, 1981, several of the bank accounts were closed. Soladay and Wright were the sole signatories on the new accounts. The payroll account was an Amarillo, Texas, bank. That account remained active, with Garner, Wright and Soladay the signatories. The practice was to determine the payroll and forward sufficient funds to the account to cover payroll checks as issued. The Debtor was never a signatory on any of the bank accounts of AMCORE or its subsidiaries.

William J. Ruhe, Jr. (Ruhe), an attorney, became President of Amdal in August, 1980. When AMCORE was formed, he became secretary and general counsel of the holding company. He handled the forma-

---

3. The transaction involved purchasing oil in oceangoing tankers. It was discovered that the tankers were nonexistent. One witness testified that Mr. Garner put all of his money, all of Mrs. Garner's money, and all of the money of the corporations into this venture.

4. Upon Garner's motion the case was converted to Chapter 11 on April 28, 1982. It was converted to a Chapter 7 liquidation on February 11, 1983.

5. The Debtor and Mills had been friends since childhood. The Debtor introduced Mills to Gar-

ner in the mid–1970's and assisted Garner in employing Mills as President of Medstaff in July, 1981.

6. Garner had known Soladay since Soladay was in high school. Soladay had an accounting background and originally went to work for Garner in 1975 as comptroller of American Properties, Inc.

7. Wright and Soladay were friends from high school days.

tion of that corporation and the transactions by which Garner's other corporations became subsidiaries. He testified that one of the economies achieved by this arrangement was that there were no presidents of the subsidiaries, only vice-presidents, who would demand lesser salaries than presidents. The purpose of the December, 1981 reorganization was to get Garner out of the day to day operation of the companies so he could devote himself to his bankruptcy problems. Each of the subsidiaries operated with its vice-president and operating staff.

Ruhe's testimony described the method for payment of bills. The vice-president operating each subsidiary, and any other parties including officers of the company, who wished a bill paid, submitted a request for payment to Wright. Wright prepared a list of bills which was sent to all officers. At no time did these lists indicate that any taxes were due or unpaid. The officers noted which bills were to be paid and which could be deferred. Then Wright presented the compiled list to Soladay who, according to Ruhe's understanding, reviewed the list with Garner. Soladay then instructed Wright as to which bills should be paid.[8] The Court finds Ruhe's testimony credible.

In March, 1982 Garner and Soladay sold the building occupied by AMCORE and its subsidiaries. The $650,000.00 proceeds, which apparently represented Garner's last asset, were paid into AMCORE. Both Garner and Soladay received notes for this infusion of funds.

Wright prepared and signed the Employer's Quarterly Federal Tax Returns (Form 941). The Debtor did not sign any 941 Forms on behalf of AMCORE or its subsidiaries. Two reports to the Controller of Public Accounts of the State of Texas listed the Debtor as president of American Reprocessing and Amdal. Ruhe testified those reports were in error because those corporations had no presidents.

The early 1982 corporate minutes reflect a number of meetings of the Board of Directors. Garner, Soladay, the Debtor and Mills attended as directors of the corporation. Ruhe attended as Secretary. The minutes of these meetings reflected discussion of various corporate matters. The minutes showed no discussion of non-payment of withholding and social security taxes.[9]

On May 26 or 27, 1982, Wright discovered that several checks for payment of withholding and social security taxes had not been forwarded to the depository. Wright gave this information to the Debtor, who immediately called an informal meeting of the officers. Apparently the meeting was attended by Garner, the Debtor, Wright, Soladay, Mills and Ruhe. All parties expressed dismay over the failure to pay those taxes. However, at that time the corporation did not have funds with which to pay them. The meeting was held on a Wednesday or a Thursday. The Debtor left on Friday, May 28, 1982 for a scheduled vacation. He returned to Dallas on Monday, May 31.

On June 2, 1982, Garner called the Debtor into his office and told him that things were not working out and advised him to seek other employment. Although Garner stated that he did not consider this a termination of the Debtor's employment, the Debtor felt that he had been terminated.[10] Garner acknowledged that Soladay and Wright knew they were not to take orders

---

8. Both Garner and Soladay asserted that they did not control disbursements of the companies. They had a long business relationship, particularly in the financial area. They were the principal stockholders of AMCORE. They had other joint business ventures. They each put a substantial amount of money into AMCORE from the sale of the building, and both were assessed with the 100% penalty (although Garner could not remember if he had been so assessed).

9. On February 22, 1982, American Reprocessing, Inc. filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, No. 382–00234–11. The case was subsequently converted to a liquidation under Chapter 7.

10. Telling a person that things are not working out and that he should seek employment elsewhere is a recommended method of termination. See McCormick, "How to Fire People Fairly," *Spirit* Magazine, December, 1988 at 23 (Southwest Airlines).

from the Debtor subsequent to that date. The Debtor testified that he was in the office only a few days during the month of June and that he took accrued vacation during the month of July, so he tendered his resignation effective July 31, 1982.

Mills became concerned over the failure to pay trust fund taxes and tendered his resignation on June 3, 1982. He was re-hired as a consultant on June 7, 1982. Ruhe left the company in July, 1982 because he, too, was concerned over the failure to pay taxes. At least through September 30, 1982, Wright and Soladay remained with the company.

On January 24, 1983 AMCORE had an Involuntary Petition filed against it in Case No. 383–00138. An order for relief was granted in Chapter 7 on January 31, 1983. The IRS filed a claim in the amount of $211,592.42, which is Claim # 31 on the AMCORE Claims Docket.

### Statute

Under the Internal Revenue Code, every employer is required to withhold Federal income and Social Security taxes from its employees' wages. The withheld sums are commonly referred to as "trust fund taxes," reflecting the provisions of the I.R.C. that such withholdings are deemed to be a "special fund in trust for the United States." I.R.C. § 7501(a). See *Commonwealth National Bank of Dallas v. United States*, 665 F.2d 743, 749 (5th Cir.1982). Employees are credited for the withholding regardless of actual payment. A failure by the employer to pay withheld taxes results in a loss to the government. To lessen such loss, under I.R.C. § 6672 the government may proceed directly against persons responsible for collecting and paying the withholding taxes who have willfully failed to pay. Though this recoupment is labeled a penalty, it is civil in nature and permits the government to recover its losses. *United States v. Twomey*, 24 B.R. 799, 802 (Bankr.W.D.N.Y.1982).

I.R.C. § 6672 imposes a liability separate and distinct from the employer's liability for the withheld taxes and it imposes that liability upon persons other than the employer. The pertinent portion of I.R.C. § 6672(a) (Pamph.Supp.1988) reads as follows:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

I.R.C. § 6671(b) defines "person," for purposes of I.R.C. § 6672, as follows:

The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

### Discussion

The Debtor filed a motion for determination of his tax liability pursuant to § 505. This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

The Debtor was President and Chief Executive Officer of a holding company which had financial control over its subsidiaries. The Debtor has the burden of proving that the IRS assessments made against him are improper. In other words, he has the burden of showing that he is not a "person required to collect ..." under I.R.C. § 6672, *supra. See also, Terrell v. United States*, 835 F.2d 1439 (11th Cir. 1987) (affirming *United States v. Terrell (In re Terrell)*, 59 A.F.T.R.2d 915 (N.D. Ala.); *Bradford v. Egger (In re Bradford)*, 35 B.R. 166, 169 (Bankr.W.D.Va.1983).

The Government contended that the Debtor is a responsible person pursuant to I.R.C. § 6672 because he was a shareholder, director, president and chief executive officer of AMCORE, the holding company which wholly owned and controlled its sub-

sidiaries. In addition, the Government asserted that he participated in corporate meetings at which corporate business was transacted and in decisions on corporate financing, raising working and/or investment capital, guaranteeing corporate debts, hiring employees, and which creditors were paid. The IRS further contended that the Debtor willfully and intentionally failed to collect, account for and pay over trust-fund taxes because (1) he was aware of the obligation to collect, account and pay over employment trust-fund taxes, (2) he was aware of the deteriorating financial condition of AMCORE and its subsidiaries, (3) he made no effort to insure that the employment trust-fund taxes would be paid after learning that such taxes had not been paid, and (4) he allowed payment to other creditors while the trust-fund taxes were unpaid. The Government pointed out that the Debtor learned of the non-payment of taxes in late May, 1982, and that his resignation was not effective until July 31, 1982.

There are two elements to liability under I.R.C. § 6672. The first is that a person upon whom liability is to be imposed must be a "person required to collect, truthfully account for, and pay over any tax." The second requirement is that such a person willfully and without reasonable cause failed to collect, truthfully account for, or pay over taxes. *Howard v. United States,* 711 F.2d 729, 733 (5th Cir.1983).

■ In *Liddon v. United States,* 448 F.2d 509 (5th Cir.1971) *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972), the Court summarized prior courts' rulings:

> The courts have taken a broad view of who is a person responsible for collecting and paying over taxes required to be withheld from employees' wages. Although the mere holding of corporate office does not of itself make for personal liability on the part of the officer, liability for the penalty is not confined to "disbursing officers" or officers with authority to draw or sign checks.
>
> In reaching a determination with respect to the person or persons upon whom to impose responsibility and liability for the

failure to pay taxes, the courts have tended to disregard the mechanical functions of the various corporate officers, and, instead, have searched for the person or persons who could have seen to it that the taxes were paid, a person with ultimate authority over expenditures of corporate funds who can fairly be said to be responsible for the corporation's failure to pay over its taxes.

*Id.* at 512–13 (citing 22 A.L.R.3d 8, 50). The test is functional: So long as a person has ultimate authority over corporate funds and effective power to see to it that federal employment taxes withheld by an employer are paid, he or she qualifies as a responsible person. *Commonwealth, supra,* at 752. "We are concerned with actual control and economic reality, not paper facades." *First National Bank in Palm Beach v. United States,* 591 F.2d 1143, 1149 (5th Cir.1979).

■ Applying these principles to the case at hand, we find that the Debtor was President and Chief Executive Officer of AMCORE. Normally one would expect the President and Chief Executive Officer to be a "responsible person" within the terms of I.R.C. § 6672. However, further examination reveals that he was merely a figurehead placed in those positions at a time when Garner was in serious financial difficulty and seeking to avoid a finding that the corporations were his alter egos. Because of his background in the investment banking business, the Debtor was employed to raise funds for the corporations. He had no operating control over the subsidiaries because they were each being run by a vice president. While it is true that the Debtor had some stock in AMCORE and, on one occasion, personally guaranteed an AMCORE debt, these isolated transactions did not give him control over the disbursement of funds. The Debtor never had authority to sign checks on behalf of the corporation. He never had authority to say which bills the corporation would pay; he could only send in requests for payment and review lists of outstanding obligations to suggest which could be deferred because of the corporation's tight

financial circumstances. It is significant that the lists never indicated any unpaid taxes. On May 26 or 27, immediately before a long holiday weekend, the Debtor learned of the unpaid taxes. He was fired less than seven days later, on June 2. Following his firing he had no control over any portion of the corporation. He tendered his resignation, effective July 31, 1982 in order to take advantage of accrued vacation and some corporate benefits which, apparently, he never received.

It is clear to this Court that, while Garner released the *title* of President and Chief Executive Officer of AMCORE, he never released *control* of the corporation. Garner maintained offices in the corporate headquarters, he engaged regularly in meetings concerning corporate matters and he, together with Soladay, determined which corporate bills were paid.

That the Debtor did not control payment of taxes is illustrated by the fact that the failure to pay continued for several months following the Debtor's firing on June 2, 1982 and the effective date of his resignation on July 31, 1982. Had the Debtor been preventing payment of taxes, the officers of the corporation could certainly have paid them, at least for the periods of time occurring after his firing on June 2, 1982. They failed to do so. The evidence indicated that withholding and social security taxes were not paid for the third quarter of 1982 ending September 30. The Court reviewed the numerous cases cited in the Government's brief. Those cases have a common thread; the person involved, regardless of the title or position with the corporate taxpayer, or the lack of such a title or position, controlled the payment of bills by the corporation and allowed other creditors to be paid when taxes were due. In this case the Debtor had no control, actual or otherwise, over the bills which were paid and, between the time he became aware that taxes were unpaid and his firing, he had no opportunity to take any steps whatsoever to see that the taxes were paid. The Debtor met his burden of

showing that he is not a responsible officer under I.R.C. § 6672.

ORDER ACCORDINGLY.[11]

---

**11.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.